## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**SHELTER LIFE INSURANCE COMPANY**                                    **PLAINTIFF**

**V.**                          **CASE NO. 4:12CV00098 BSM**

**CHRISTINE MECHAM**                                               **DEFENDANT**

**V.**

**RYAN WEBB**                                                      **INTERVENOR**

### BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

In this interpleader action, the Court is asked to determine the rightful beneficiary of two insurance policies (the "Policies") on the life of Steve Henderson. Christine Mecham, one of Mr. Henderson's closest friends, is the named beneficiary of the Policies pursuant to two change of beneficiary forms (the "Forms") executed by Mr. Henderson in 2008. The intervenor, Ryan Webb, who was Mr. Henderson's life insurance agent and nephew, claims that the Forms should be set aside due to forgery or undue influence. The parties have completed fact-witness discovery, and the undisputed, material facts demonstrate that Mr. Webb cannot meet his burden of proof to set aside the Forms, that his claims to set aside the Forms are barred by laches, and that Ms. Mecham is entitled to summary judgment on her claim for the proceeds of the Policies.

## I.       Undisputed, Material Facts

Mr. Henderson died on December 29, 2011.[1]  He has been a quadriplegic since the 1970s.[2]  Although Mr. Henderson was a quadriplegic, he could write with the assistance of a brace.[3]  Mr. Henderson was also able to work independently as a contractor.[4]  It was through his work as a contractor that he met Ms. Mecham and her family.[5]

In 2006, Ms. Mecham and her husband George decided to purchase property in Arkansas next to a vacation home owned by their neighbor in Florida.[6]  Their neighbor had recommended Mr. Henderson as a general contractor.[7]   Ms. Mecham and Mr. Henderson hit it off as friends.[8]  Mr. Henderson got along well with Ms. Mecham's husband, and her son, Hugh.[9]  The Mechams and Mr. Henderson's family became close, but he and Ms. Mecham were what she has called "soul mates," and over the next few years, Mr. Henderson and Ms. Mecham would visit often on the phone, and she would see him anytime she was in Arkansas.[10]  Mr. Henderson and Ms. Mecham loved each other as friends.[11]

---

[1] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 27.
[2] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 8.
[3] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 20 and Exhibit 1-A; Exhibit 2, Deposition of Gail Williams, at p. 56, lines 1-6.
[4] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 5.
[5] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 5-7.
[6] Exhibit 1, Affidavit of Christine Mecham, at ¶ 3.
[7] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 5.
[8] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 7.
[9] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 9-11.
[10] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 9-13.
[11] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 9.

Mr. Henderson lived next to his sister, Gail Williams, in Mountain View, Arkansas.[12]  His mother also lived across the street, and his other sister, Debbie Webb, lived next to Mr. Henderson until a few years before his death.[13]  Ryan Webb is Mr. Henderson's nephew and Debbie Webb's son.

Mr. Henderson's neighbor, Everett Saddler, testified that Mr. Henderson was bothered that his family, especially his sisters, did not come by to see him very often, even though they lived next door.[14]  Mr. Saddler would often sit with Mr. Henderson, and he and his wife would bring food to Mr. Henderson on holidays so that Mr. Henderson would not have to spend the day alone in his home.[15]

In 2007, after speaking with his nephew Ryan Webb, Mr. Henderson applied for life insurance through Shelter Life Insurance Company ("Shelter").[16]  Mr. Henderson obtained two policies in the total amount of $150,000, and he named Mr. Webb as the beneficiary.[17]  Mr. Webb wrote the application, and he witnessed Mr. Henderson's signatures on the applications.[18]

During this time, Mr. Henderson continued work on the Mechams' house, and he and the Mecham family continued to become closer.[19]  Ms. Mecham's son would often

---

[12] See Exhibit 11, Deposition of Everett Saddler, at p. 30, lines 7-8.
[13] See Exhibit 11, Deposition of Everett Saddler, at p. 30, lines 7-8.
[14] See Exhibit 11, Deposition of Everett Saddler, at p. 21, lines 6-12 and p. 23, lines 10-13.
[15] See Exhibit 11, Deposition of Everett Saddler, at p. 23, lines 14-19.
[16] See Exhibit 3, Deposition of Ryan Webb, at p. 22, lines 2-17.
[17] See Exhibit 3, Deposition of Ryan Webb, at p. 22, lines 15-24; Exhibit 4, Life Insurance Policies.
[18] See Exhibit 14, Applications for Insurance.
[19] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 9-11.

stay with Mr. Henderson.[20]  Her son was also close to Mr. Henderson's brother-in-law, Alan Williams.[21]  Ms. Mecham and Mr. Henderson continued to grow closer in 2007 and 2008, spending time together when she was in town and often speaking on the phone when she was in Florida.[22]

In June 2008, Mr. Henderson decided to change the beneficiary of his life insurance from his nephew to Ms. Mecham.[23]  He contacted Shelter to request change of beneficiary forms (the "Forms").[24]  Shelter took steps to verify that the person who called was indeed Mr. Henderson, and mailed him the Forms to change the beneficiary of the Policies.[25]  Mr. Henderson filled out the Forms, signed them, and returned them to Shelter.[26]  Pursuant to Mr. Henderson's requests, Mr. Webb was not given copies of the Forms or the correspondence from Shelter regarding the change.[27]  Mr. Henderson did not inform Ms. Mecham that he had named her as the beneficiary of the Policies until 2011.[28]

In the latter part of 2009, Mr. Henderson's physical health began to decline to the point that his family considered continued nursing home care.  Instead, they decided that

---

[20] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 11.

[21] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 13; Exhibit 2, Deposition of Gail Williams, at p. 66, line 25 to p. 67, line 2.

[22] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 9-11.

[23] See Exhibit 6, Deposition of Toni Swiney, at p. 12, line 21 to p. 14, line 10 and p. 19, lines 2-13; Exhibit 7, Change of Beneficiary Forms.

[24] See Exhibit 6, Deposition of Toni Swiney, at p. 12, line 21 to p. 14, line 10 and p. 19, lines 2-13; Exhibit 7, Change of Beneficiary Forms.

[25] See Exhibit 6, Deposition of Toni Swiney, at p. 14, line 24 to p. 15, line 3 and p. 20, line 24 to p. 21, line 2.

[26] Exhibit 7, Change of Beneficiary Forms.

[27] See Exhibit 6, Deposition of Toni Swiney, at p. 14, lines 8-23 and p. 16 line 9 to p. 17, line 12.

[28] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 15.

Mr. Henderson could live with his sister, Gail Williams, which would allow Ms. Williams to receive money from Medicaid.[29]  In order to become eligible for Medicaid, Mr. Henderson gave away some real property that he owned to his neighbor, Everett Saddler.[30]  Ms. Williams believed that Medicaid required information regarding whether Mr. Henderson had life insurance, so she approached her nephew requesting information regarding Mr. Henderson's life insurance.[31]  Mr. Webb pulled Mr. Henderson's file electronically and discovered that Mr. Henderson had changed the beneficiary in 2008 from Mr. Webb to Ms. Mecham.[32]

Mr. Webb never asked Mr. Henderson about this change.[33]  He never expressed any question about the authenticity of the signature to Ms. Mecham or to Shelter.[34]  Mr. Webb, who witnessed Mr. Henderson's signatures on the application in 2007 and on the deeds to Mr. Saddler in 2009, did not question the validity of the signatures when he reviewed the change of beneficiary forms in 2009.[35]

In 2010, Mr. Henderson contacted another nephew, Tyler Henderson, who was in law school, about preparing a will.[36]  Mr. Henderson indicated in that conversation with

---

[29] See Exhibit 3, Deposition of Ryan Webb, at p. 25, line 19 to p. 26, line 3; Exhibit 11, Deposition of Everett Saddler, at p. 35, lines 1-4; Exhibit 10, Letter from Arkansas Department of Human Services to John Aldworth dated September 27, 2012.

[30] See Exhibit 11, Deposition of Everett Saddler, at p. 31, line 16 to p. 32, line 25; Exhibit 12, Quitclaim Deeds.

[31] See Exhibit 3, Deposition of Ryan Webb, at p. 25, lines 6-23; Exhibit 2, Deposition of Gail Williams, at p. 69, lines 18-23

[32] See Exhibit 3, Deposition of Ryan Webb, at p. 26, line 18 to p. 28, line 4.

[33] See Exhibit 3, Deposition of Ryan Webb, at p. 28, lines 5-6 and p. 29, lines 9-24.

[34] See Exhibit 3, Deposition of Ryan Webb, at p. 39, line 15 to p. 40, line 1.

[35] See Exhibit 3, Deposition of Ryan Webb, at p. 26, line 18 to p. 28, line 4.

[36] See Exhibit 15, Affidavit of J. Tyler Henderson, at ¶ 5.

Tyler, [37] that it was his intention to "leave everything" to Ms. Mecham. [38] Tyler informed

his uncle that he could not help him until after he became a licensed attorney. [39]   Mr.

Henderson's decision to name Ms. Mecham as the beneficiary of his life insurance was

confirmed by his later conversations with Tyler regarding Mr. Henderson's wishes for his

estate, including his life insurance. [40]

In 2011, Mr. Henderson asked his caregiver, Sherry Williams, to send him a blank

will. [41]  Sherry [42] went with Mr. Henderson into his office, where he asked her to fill in the

blanks according to his instructions. [43]  During this visit, Mr. Henderson told Sherry that

he had named Ms. Mecham as the beneficiary of the Polices, and that his intention was

that Ms. Mecham be left everything, including the proceeds of his life insurance, when he

died. [44]

Later in 2011, Mr. Henderson's health began to decline. [45]  Mr. Henderson suffered

a stroke in December while hospitalized to treat an infection. [46]   As Mr. Henderson's

health began to deteriorate, so did Ms. Mecham's relationship with Mr. Henderson's

sisters, particularly Gail Williams. [47]  In 2011, Mr. Henderson had named Ms. Mecham as

his power of attorney, so, when he was hospitalized, it was Ms. Mecham and not Ms.

---

[37] Tyler Henderson is referred to by his first name to avoid confusion with his uncle.
[38] See Exhibit 15, Affidavit of J. Tyler Henderson, at ¶ 6.
[39] See Exhibit 15, Affidavit of J. Tyler Henderson, at ¶ 7.
[40] See Exhibit 15, Affidavit of J. Tyler Henderson, at ¶ 10.
[41] See Exhibit 16, Affidavit of Sherry Williams, at ¶ 5-11.
[42] Sherry Williams is referred to by her first name to avoid confusion.
[43] See Exhibit 16, Affidavit of Sherry Williams, at ¶ 6-10.
[44] See Exhibit 16, Affidavit of Sherry Williams, at ¶ 12-14.
[45] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 22, 24.
[46] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 24.
[47] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 26.

Williams who had the final say on Mr. Henderson's healthcare.[48]  Ms. Mecham desired to prolong Mr. Henderson's life, while his sisters did not wish to prolong his life any longer.[49]

After Mr. Henderson died on December 29, 2011, Ms. Mecham paid for his funeral.[50]  A few days after he died, Mr. Webb contacted Shelter, to confirm that Ms. Mecham was the beneficiary of his uncle's Policies, and, on that call, he reported that his family was "upset" because Mr. Henderson changed the beneficiary to Ms. Mecham.[51] Mr. Webb never contacted Shelter to question the authenticity of the Forms before Mr. Henderson died.[52]

After Mr. Henderson died, Ms. Williams filed an action in probate court, falsely stating that Mr. Henderson died intestate.[53]  Ms. Mecham then filed an action to probate Mr. Henderson's will, which Ms. Williams contested (as the family does here) on the grounds of forgery and undue influence.[54]  Ms. Williams' objections were denied, and the will was admitted to probate.[55]

After she was dismissed in state court as the personal representative of Mr. Henderson's estate, Ms. Williams was dismissed from this case, and Mr. Webb intervened.  Mr. Webb's attorneys hired a purported handwriting expert, Dawn Reed, to

---

[48] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 26.
[49] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 26.
[50] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 27; Exhibit 2, Deposition of Gail Williams, at p. 49, lines 7-8.
[51] See Exhibit 18, Call Logs Produced by Shelter.
[52] See Exhibit 3, Deposition of Ryan Webb, at p.39, line 15 to p.40, line 1.
[53] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 28-29.
[54] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 28-29.
[55] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 28-29.

give an opinion that the signatures on the Forms did not match "known" writings of Mr. Henderson.[56]   In order to obtain the "known" signatures of Mr. Henderson, Ms. Reed enlisted the help of Gail Williams, who claimed to be able to distinguish between signatures of her brother and signatures of others who signed documents on his behalf.[57]

Mr. Henderson could write with a brace, but over the years, he often requested or required other people to sign documents on his behalf.[58]   Ms. Williams, who had the only access to Mr. Henderson's house after he died, sifted through checks and other documents to determine which documents bore what she believed to be Mr. Henderson's true signatures.[59]   Ms. Williams gave those documents to Ms. Reed to prepare a report comparing the signature on the Forms with Mr. Henderson's other signatures.[60]

During her deposition, Ms. Williams was shown one of the Forms and was asked to compare it to Mr. Henderson's signature on the original application, which no party disputes is Mr. Henderson's signature.[61]   Ms. Williams testified that the signature on the Form was the same as the signature on the original application, thus contradicting Ms. Reed's report.[62]

---

[56] See Exhibit 3, Deposition of Ryan Webb at p. 32, line 22 to p. 33, line 7.

[57] See Exhibit 2, Deposition of Gail Williams, at p. 90, line 22 to p. 92, line 24.

[58] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 20, 21 and Exhibit 1-A; Exhibit 2, Deposition of Gail Williams, at p. 54, lines 1-3 and p. 56, lines 1-6; Exhibit 5, Deposition of Alan Williams, at p. 32, lines 18-21.

[59] See Exhibit 2, Deposition of Gail Williams, at p. 90, line 22 to p. 92, line 24.

[60] See Exhibit 2, Deposition of Gail Williams, at p. 90, line 22 to p. 92, line 24.

[61] See Exhibit 2, Deposition of Gail Williams, at p. 128, line 14 to p. 129, line 9 and Exhibits 4 and 7 to Ms. Williams' Deposition.

[62] See Exhibit 2, Deposition of Gail Williams, at p. 128, line 14 to p. 129, line 9 and Exhibits 4 and 7 to Ms. Williams' Deposition.

Mr. Webb never asked Mr. Henderson why or if he had changed the beneficiary of his Policies from Mr. Webb to Ms. Mecham.[63]   Neither did Mr. Henderson's sisters.[64] Mr. Webb never reported to Shelter that he believed the Forms were forged or obtained through undue influence.[65]   While Mr. Henderson's nephew and his sisters claim that the signatures on the Forms are not Mr. Henderson's (as they unsuccessfully challenged in the will contest), they cannot state who they believe signed the Forms or, if the signatures were not Mr. Henderson's, whether they were signed on Mr. Henderson's behalf.[66]

Ms. Mecham did not know that Mr. Henderson had life insurance until 2010, after the Forms were executed and delivered to Shelter.[67]   In 2010, Mr. Henderson told Ms. Mecham that he had contacted his nephew about preparing a will, and, in the course of that conversation, he mentioned that he had purchased life insurance in 2008.[68]   In 2011, after signing his will and related documents, Mr. Henderson told Ms. Mecham that he had named her the beneficiary of his life insurance and that he was "leaving everything" to her.[69]   Mr. Henderson confirmed his intentions regarding his estate and life insurance with Sherry Williams, his long-time caregiver, and his nephew, Tyler Henderson.[70]

---

[63] See Exhibit 3, Deposition of Ryan Webb, at p. 28, lines 5-6 and p. 29, lines 9-24.

[64] See Exhibit 2, Deposition of Gail Williams, at p. 69, line 25 to p. 72, line2; Exhibit 13, Deposition of Debbie Webb, at p. 20, line 14 to p. 21, line 4.

[65] See Exhibit 3, Deposition of Ryan Webb, at p. 39, line 15 to p. 40, line 1.

[66] See Exhibit 2, Deposition of Gail Williams, at p. 82, lines 10-21; Exhibit 3, Deposition of Ryan Webb, at p. 45, lines 10-14.

[67] See Exhibit 1, Affidavit of Christine Mecham at ¶ 16.

[68] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 15.

[69] See Exhibit 1, Affidavit of Christine Mecham, at ¶ 15.

[70] See Exhibit 15, Affidavit of J. Tyler Henderson, at ¶ 10; Exhibit 16, Affidavit of Sherry Williams, at ¶ 12-14.

Ms. Mecham never asked Mr. Henderson to name her as the beneficiary of his life insurance or that he bequeath his property to her.[71]  She did not sign the Forms, or request anyone, including Mr. Henderson, to sign the Forms.[72]  Ms. Mecham was in Florida in June and July of 2008 when Mr. Henderson corresponded with Shelter.[73]  She has testified that she never asked, suggested, implied, coerced, encouraged, or discouraged Mr. Henderson to do anything with his property, including his life insurance.[74]

## II.      Standard for Motion for Summary Judgment

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Scheeler v. City of St. Cloud*, 402 F.3d 826, 830 (8th Cir. 2005).  To successfully oppose a motion for summary judgment, the nonmoving party "must demonstrate the existence of specific facts that create a genuine issue for trial; mere allegations or denials are not enough."  *Lambert v. City of Dumas*, 187 F.3d 931, 934-35 (8th Cir. 1999).  "The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in [plaintiff's] favor on more than mere speculation, conjecture, or fantasy."  *Mann v. Yarnell*, 497 F.3d 82, 825 (8th Cir. 2007) (internal citations and quotations omitted).  Courts must "look to the substantive law to determine whether an element is essential to a case, and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

---

[71] See Exhibit 1, Affidavit of Christine Mecham at ¶ 16.
[72] See Exhibit 1, Affidavit of Christine Mecham at ¶ 19.
[73] See Exhibit 1, Affidavit of Christine Mecham at ¶ 18.
[74] See Exhibit 1, Affidavit of Christine Mecham at ¶ 30.

judgment." *Wells Fargo Fin. Leasing, Inc. v. LMT Fette, Inc.,* 382 F.3d 852 (8th Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.    Argument

### A.    The Forms are presumed valid, and Mr. Webb has the burden of proving forgery or undue influence.

As the Arkansas Supreme Court has recognized, "provisions in life insurance contracts with references to beneficiaries or changes in beneficiaries are in the nature of a last will and testament and, therefore, are construed in accordance with the rules applicable to the construction of wills." See *Primerica Life Ins. Co. v. Watson*, 362 Ark. 54, 61, 207 S.W.3d 443, 448 (2004). Once the proponent of a document such as a will shows that the will is rational on its face, "the party challenging the [document's] validity is required to prove by a preponderance of the evidence that the document" should be set aside. *In Re Estate of Davidson*, 310 Ark. 639, 643, 839 S.W.2d 214, 216 (1992). Mr. Webb has challenged the Forms as forgeries. In the alternative, Mr. Webb argues that they were executed as a result of undue influence. Mr. Webb cannot meet his burden of proving forgery or undue influence, and Ms. Mecham is entitled to summary judgment on those claims.

### B.    Mr. Webb clearly expressed his intention to leave the proceeds of his life insurance to Ms. Mecham.

Three people have submitted affidavits stating that it was Mr. Henderson's intention to "leave everything" to Ms. Mecham, specifically including his insurance proceeds and that Mr. Henderson had named Ms. Mecham as the beneficiary of the

Policies. This fact, standing alone, entitles Ms. Mecham to summary judgment under *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902 (8th Cir. 2010).

In *Conseco Life*, just before the insured died of cancer, her sister, using a power of attorney, named herself as the beneficiary of the insured's life insurance policy in the place of the insured's children. Both the sister and the children made a claim on the policy, and the insurance company filed an interpleader action. The sister presented proof in the form of affidavits that the insured had expressed her desire to change the beneficiary of her life insurance to name her sister in place of her sons. The district court granted summary judgment "finding that—based in part on the affidavits—[the insured] intended to change the beneficiary and there was no evidence of overreaching; [the children] failed to meet [the sister's] proof with proof because mere suspicions are not evidence … and there was no evidence that [the insured] was incompetent." *Conseco Life Ins. Co.*, 620 F.3d at 906. The Eighth Circuit affirmed, relying primarily on *Primerica Life Ins. Co. v. Watson*, 362 Ark. 54, 207 S.W.3d 443 (2004).

The Eight Circuit noted that the affidavits involving the insured's intent were "undoubtedly parol evidence and therefore hearsay." *Conseco Life Ins. Co.*, 620 F.3d at 907. However, the court noted that in *Primerica* the Arkansas Supreme Court held that an insured's statement regarding his intent to change his life insurance is admissible. *Id.* Thus under *Conseco Life* and *Primerica*, an insured's statement regarding a future intent to change a policy's beneficiary is admissible, as is a statement regarding an insured's past act in furtherance of his intent. See *Conseco Life Ins. Co.*, 620 F.3d at 908; *Primerica Life Ins. Co.*, 362 Ark. at 60-61, 207 S.W.3d at 447-48.

Here, Mr. Henderson's intent is undisputed.  He called Shelter inquiring about changing the beneficiary of the Policies, and Shelter returned the Forms to him.  Shelter verified Mr. Henderson's identity and his signatures on the Forms.  Shelter then sent him confirmation that it had changed the Policies' beneficiary to Ms. Mecham.  Later, in 2010 and 2011, Mr. Henderson made statements (to Sherry Williams, Tyler Henderson, and Ms. Mecham) in support of his naming Ms. Mecham as the beneficiary of his Policies and his intention that she should receive the Policies' proceeds.  Because Mr. Henderson intended that Ms. Mecham receive the proceeds under the Polices and because he named her the beneficiary of the Policies, she is entitled to summary judgment on her claim for the proceeds.

**C.    Mr. Webb has no evidence of undue influence**.

In the answer attached to his motion to intervene, Mr. Webb alleged that Ms. Mecham exercised undue influence over Mr. Henderson in order to become the beneficiary of his life insurance.  Mr. Webb has no evidence of undue influence.

It is generally recognized that, in order to invalidate a contract on the ground of undue influence, a party must be deprived of his free will.  *Dent v. Wright,* 322 Ark. 256, 909 S.W.2d 302 (1995).  As noted above, contracts for insurance are generally construed in the same manner as wills.  In the will context, two elements are required to prove undue influence: (1) the influence must result from "fear, coercion, or other cause that deprives the testator of his free agency in the disposition of his property" and not that from natural affection and (2) the influence must have a direct connection to the

execution of the will and the purpose of procuring a will to the benefit of certain parties.

*Abel v. Dickinson*, 250 Ark. 648, 657-58, 467 S.W.2d 154, 158-59 (1971).

> The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property.   And the influence must be specially directed toward the object of procuring a will in favor of particular parties.

*Hollingsworth v. Hollingsw*orth, 240 Ark. 582, 586, 401 S.W.2d 555, 557 (1966).

"Influence" that consists of "appeals, requests, entreaties, arguments, flattery, cajolery, persuasion, solicitations, or even importunity is legitimate and becomes 'undue,' so as to invalidate the will, only when it is extended to such a degree as to override the discretion and destroy the free agency of the testator."  *Edwards v. Vaught*, 284 Ark. at 267, 681 S.W.2d at 325.   "When it is contended that a [document] was obtained by duress or undue influence, the law requires that the proof be clear, cogent, and convincing before the [document] can be set aside."  *Hankins v. Austin*, 2012 Ark. App. 641, at * 7, ___ S.W.3d ___ (2012).  Where the mind of the contracting party is strong and alert, the facts constituting undue influence must be stronger than where the mind of the contracting party is impaired either by some inherent defect or by the consequences of disease or advancing age.  *Pyle v. Sayers,* 344 Ark. 354, 39 S.W.3d 774 (2001).

The Arkansas Supreme Court held that there was no undue influence in the *Abel* case cited above when the testatrix left property to a friend and the friend's son; there was no evidence that the testatrix acted under fear or duress.  250 Ark. 658-59, 467 S.W.2d at 159.  The Arkansas Supreme Court also has held that no undue influence existed when

14

the testatrix left property to the Methodist Church and its affiliates, some family members other than the primary beneficiaries, and some charities. *In re Estate of Davidson*, 310 Ark. at 646, 839 S.W.2d at 218. The court stated that the bequests were understandable and reasonable the testatrix had been a faithful member of the Methodist Church during her life. *Id*.

Here, Ms. Mecham and Mr. Henderson were undisputedly close friends, while Mr. Henderson had a rocky relationship with his sisters. Ms. Mecham never asked, suggested, implied, coerced, encouraged, or discouraged Mr. Henderson to do anything with regard to the Policies. There is no evidence of any sinister behavior on the part of Ms. Mecham towards Mr. Henderson. Instead, the undisputed evidence shows that Mr. Henderson, by his own free will, chose to change the beneficiary of the Policies to Ms. Mecham, which is consistent with his entire estate plan. Accordingly, Ms. Mecham is entitled to summary judgment on Mr. Webb's undue influence claims.

**D.      Mr. Webb has no competent evidence that the Forms are forgeries.**

Mr. Webb claims that the Forms are forgeries. The Arkansas Supreme Court has long recognized that the term "forgery" "has a fixed legal meaning. It is the fraudulent making or alteration of any writing to the prejudice of another man's rights, or a false making *malo animo* of any written instrument for the purpose of fraud or deceit." *Van Horne v. State*, 5 Ark. 349, 1844 WL 390, *2 (Ark. 1844). A forgery is similarly defined as "[a] false or altered document made to look genuine by someone with the intent to deceive." BLACK'S LAW DICTIONARY 661 (7th ed. 1999).

Mr. Henderson's actions and intent described above refute any inference of the "evil intent" necessary to support a forgery claim.  And other than Mr. Webb's expert's assumption that the signatures on the Forms are "simulations," Mr. Webb has no evidence to support the fraudulent making or alteration of the Forms.

In order to obtain the "known" signatures of Mr. Henderson, Ms. Williams looked through Mr. Henderson's belongings to  determine which documents contained what she believed were Mr. Henderson's true signatures.  Ms. Williams gave those documents to her nephew's expert to prepare a report comparing the signature on the Forms with Mr. Henderson's other signatures.

During her deposition, Ms. Williams was shown one of the Forms and was asked to compare it to Mr. Henderson's signature on the original application, which no party disputes is Mr. Henderson's signature.  Ms. Williams testified that the signature on the Form was the same as the signature on the original application.[75]  Thus, Ms. Williams cannot distinguish between signatures that are truly Mr. Henderson's and those allegedly signed by others.  Nevertheless, Mr. Webb and his expert chose Ms. Williams to be the gatekeeper of Mr. Henderson's "known" signatures.

It is undisputed that Mr. Henderson wrote and signed his name with the aid of a brace.  At times, however, whether as a result of convenience or necessity, Mr. Henderson would have others sign his name.  Although Mr. Webb and Ms. Williams claim that Mr. Henderson did not sign his name to the Forms, they do not know who

---

[75] It is unknown whether Mr. Webb's designated expert compared Mr. Henderson's signatures on the applications with the signatures on the Forms.

signed his name or why that person signed it, or whether the Forms were fraudulently signed.

Mr. Webb simply has no evidence to support his contention that the Forms are forgeries, and Ms. Mecham is entitled to summary judgment on the forgery claim.

**E.      Mr. Webb's claims are barred by laches.**

Finally, Mr. Webb's claims are barred by laches.  The doctrine of laches is an equitable principle premised on some detrimental change in position made in reliance upon the action or inaction of another party.  *Goforth v. Smith*, 338 Ark. 65, 78, 991 S.W.2d 579, 587 (1999).  It is based upon the assumption that the party to whom laches is imputed has knowledge of his rights and the opportunity to assert them, that by reason of his delay some adverse party has good reason to believe those rights are worthless or have been abandoned, and that because of a change of condition during this delay it would be unjust to the latter party to allow the knowing party to assert those rights.  *Id.* Stated another way, laches is ordinarily applied to situations in which the complainant stood idly by while the other party has materially changed his position.  *Richards v. Ferguson,* 252 Ark. 484, 486, 479 S.W.2d 852, 853 (1972).

Here, in 2009, Mr. Webb knew that Mr. Henderson changed the beneficiary of the Policies to Ms. Mecham.  Despite knowing of the change of beneficiary, Mr. Webb never discussed the change with Mr. Henderson, Ms. Mecham, or anyone at Shelter.  Mr. Webb, his mother, and his aunt waited until after Mr. Henderson died to challenge the Forms based on forgery and undue influence.  These allegations could have been rebutted by Mr. Henderson during his life.  Instead, despite his knowledge of the Forms during

17

Mr. Henderson's life, Mr. Webb stood idly by until after Mr. Henderson died.  This inaction and delay materially changed Ms. Mecham's opportunity to obtain sworn testimony from Mr. Henderson confirming that Ms. Mecham is the intended beneficiary of the life insurance policies.  Instead, she has incurred the litigation expenses associated with this interpleader action in order to obtain sworn statements regarding Mr. Henderson's intentions from two disinterested witnesses, Sherry Williams and Tyler Henderson.  Accordingly, Mr. Webb should be estopped from asserting any claim related to the validity of the Forms under the doctrine of laches.

## IV.    Conclusion

As set out above, the undisputed, material facts demonstrate that Mr. Webb cannot meet his burden of proof to set aside the Forms, that his claims to set aside the Forms are barred by laches, and that Ms. Mecham is entitled to summary judgment on her claim for Mr. Henderson's insurance proceeds.  For all of these reasons, the Court should grant Ms. Mecham's motion for summary judgment.

Respectfully submitted,

By: /s/ Clayborne S. Stone

Clayborne S. Stone, Ark. Bar No. 2003102
Alex T. Gray, Ark. Bar No. 2008127
MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Phone:  501-688-8886
Fax:  501-918-7886
Email: cstone@mwlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 14, 2013, a true and correct copy of the above and foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

James Melton Sayes
Matthews, Sanders & Sayes
825 West Third Street
Little Rock, AR72201
news@msslawfirm.com

*Attorneys for Shelter Insurance Company*

Casey P. Castleberry
Tom Thompson
Murphy, Thompson, Arnold, Skinner & Castleberry
P.O. Box 2595
Batesville, AR 72503-2595
Caseycastleberry2003@yahoo.com
Aftomt2001@yahoo.com

*Attorneys for Ryan Webb*

/s/ Clayborne S. Stone