IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**SHELTER LIFE INSURANCE COMPANY**                               **PLAINTIFF**

**V.**                          **CASE NO. 4:12CV00098 BSM**

**CHRISTINE MECHAM**                                              **DEFENDANT**

**V.**

**RYAN WEBB**                                                     **INTERVENOR**

**INTERVENOR RYAN WEBB'S BRIEF IN SUPPORT OF HIS RESPONSE TO DEFENDANT CHRISTINE MECHAM'S MOTION FOR SUMMARY JUDGMENT**

In response to Defendant Chris Mecham's Motion for Summary Judgment, Intervenor Ryan Webb, through undersigned counsel, submits the following brief:

**Facts taken in the light most favorable to Intervenor Webb show that disputed issues of material fact exist in this proceeding**

A.   Objections to Factual Statements made in Defendant's Brief

Many of the factual allegations in Ms. Mecham's brief, such as those relating to the intent of Mr. Henderson and the relationship between Mr. Henderson and Ms. Mecham are dealt with specifically in the propositions asserted below.  However, Intervenor Webb wishes to call attention to certain additional facts that are in dispute that do not necessarily relate to the issues presented *per se*.

First, contrary to the assertions made by the Defendant, the relationship between Mr. Henderson and his sisters was close until the Defendant began actively working to isolate Mr. Henderson from them.  Both Debbie Webb and Gail Williams testified that Mecham actively worked to alienate them from Steve Henderson.  Ex 2 at 26, Ex 13 at 18-19. See Intervenor's Response to Disputed Facts at Paragraph 52.

1

Second, Gail Williams did not "falsely" state that Mr. Henderson died intestate. Although Chris Mecham claimed there was a will, Gail Williams had never been provided a copy of it, and it was not produced until Chris Mecham filed her action for probate. Ex 2 at 96.

Ms. Mecham has offered no proof other than a bare affidavit statement that she was in Florida at the time the beneficiary forms were requested. Ex 1. Further, because the request was made by phone, her location at the time is irrelevant.

**B.      Summary Judgment Standard**

In evaluating a motion for summary judgment,

> Summary judgment should be granted when—viewing the facts most favorably to the nonmoving party and giving that party the benefit of all reasonable inferences—the record shows that there is no genuine issue of material fact. See Fed.R.Civ.P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.2011) (en banc). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material...." *Id*. At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial. Id. at 249, 106 S.Ct. 2505.

*Nunn v. Noodles & Co.*, 674 F.3d 910, 913-914 (8th Cir., 2012). "It is well established that courts should neither weigh evidence nor make credibility determinations when ruling on a motion for summary judgment." *Nyari v. Napolitano*, 562 F.3d 916 (8th Cir., 2009) *citing Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir.2003). Assessing evidentiary weight and credibility are not ordinarily consistent with a ruling on a summary judgment motion. *Id*. Intervenor asserts that here, many of the facts asserted as "undisputed" in the motion for summary judgment in fact rely specifically on whether the Court believes the affidavit of Christine Mecham, and as such are not appropriate for summary judgment except to the extent

that they should be considered in the light most favorable to the Intervenor – in other words, as untrue.

C.  **The facts, taken in the light most favorable to Mr. Webb, show a confidential relationship existed between Christine Mecham and Steve Henderson in which Christine Mecham was the dominant party, and further show that Ms. Mecham has affirmatively misrepresented the nature of that relationship.**

Intervenor agrees that "provisions in life insurance contracts with reference to beneficiaries or changes in beneficiaries are in the nature of a last will and testament, and, therefore, are construed in accordance with the rules applicable to the construction of wills." *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902 (2010). However, in the context of Arkansas case law, while the burden of proof may be on the person challenging the provision under normal circumstances, that burden shifts where a confidential relationship exists between the beneficiary of the will or policy and the testator or designator, and the beneficiary is a dominant party in the relationship:

> Ordinarily, the burden is upon one who attacks such a transaction to prove that the donor was unduly influenced. See *Burns v. Lucich*, 6 Ark.App. 37, 47, 638 S.W.2d 263, 269 (1982). A different burden of proof arises when it is shown that a confidential relationship existed between the donor and a dominant donee. *Id*. Where special trust or confidence has been shown, the transfer to the dominant party is presumed to be void. *Id*. Relationships deemed to be confidential are not limited to those involving legal control; they also arise whenever there is a relation of dependence or confidence, especially confidence which springs from affection on one side and a trust in reciprocal affection on the other. *Id.* at 48, 638 S.W.2d at 270. In addition to proving the existence of a confidential relationship, a party challenging such a transaction must also show that the donee occupied such a superior position of dominance or advantage as would imply a dominating influence over the donor. Id. at 49, 638 S.W.2d at 270. Each case must be determined on its own facts. *Donaldson v. Johnson*, 235 Ark. 348, 350-51, 359 S.W.2d 810, 812-13 (1962). Whether undue influence occurred is a question for the trier of fact. *Carpenter v. Horace Mann Life Ins. Co*., 21 Ark.App. 112, 121-22, 730 S.W.2d 502, 507 (1987).

*Jones v. Balentine*, 866 S.W.2d 829, 44 Ark.App. 62 (Ark. App., 1993)

3

This shift in burden of proof exists even in cases in which the confidential relationship is one involving spouses, which is certainly not the case here. *Perrin v. Perrin*, 656 S.W.2d 245, 9 Ark.App. 170 (1983). Further, this presumption should be strengthened where other factors relating to undue influence are present, such as the fact that the party receiving the bequest or proceeds is doing so to the detriment of the natural objects of the bounty of the testator or designating party, *Birch v. Coleman*, 691 S.W.2d 875, 15 Ark.App. 215 (1985) and where the dependent party is suffering from physical or mental weakness. *Marshall v. Marshall*, 271 Ark. 116, 607 S.W.2d 90 (1980). It is notable that the existence of a dominant position in the relationship is by implication from superior position in the relationship. *Jones*, supra.

Where the presumption arises, the presumption is a strong one – not simply one of production. *Dunn v. Dunn*, 255 Ark. 764, 503 S.W.2d 168 (1973); *See Birch v. Coleman*, 691 S.W.2d 875, 15 Ark.App. 215 (1985)(requiring proof by a "clear preponderance" in cases where a gift is made to a guardian). The party defending the testamentary document must demonstrate by convincing evidence that there was no undue influence, and the gift was free and voluntary. *Jamison v. Duncan*, 233 Ark. 780, 348 S.W.2d 709 (Ark., 1961)

When the facts are taken in the light most favorable to the non-moving party here, Mr. Webb has demonstrated through the affidavit of Alan Williams and its accompanying exhibits (Int. Ex. 1-4) that a physical, romantic relationship existed between Mr. Henderson and Ms. Mecham, and that, at the very least, Mr. Henderson believed that Ms. Mecham had made promises to him to marry him and believed he had a confidential relationship with her.

In addition to the affidavit and exhibits, the existence of this relationship is confirmed by Ms. Mecham's admission that she and Mr. Henderson were "soul mates" (See Ex 1), a phrase not often used outside a romantic context, by her testimony in deposition that she and Mr.

Henderson had professed their love for one another, (Int. Ex 8 at 16, 30) and by Mr. Henderson's communications with Everett Sadler who said that, "I believe in Steve's mind their relationship went a little too far. I believe he developed feelings for her that he felt was inappropriate, and told me so, that he basically felt like he was falling in love with her . . ." (Int. Ex 7 at 30.) The evidence from Mr. Henderson's computer not only confirms this position, but also confirms that the sentiment was encouraged by Christine Mecham.

Further, the dominant nature of the relationship can be seen in the letter from Steve and his expression of dependence on Christine Mecham (Int. Ex 2), and in the fact that he subsequently appointed her as his attorney in fact, as well as her actions toward his family in excluding them from his life.

In addition to requiring affirmative proof necessary to rebut a presumption of undue influence arising from such a relationship, evidence of this relationship is fundamentally inconsistent with Ms. Mecham's representation in her affidavit that she and Mr. Henderson were simply "close friends," (Ex. 1) and calls into question both her motive and the credibility of her other testimony relating to the relationship.

Concerning Mr. Henderson's intent with regard to the life insurance and any evidence that might rebut the presumption, contrary to Defendant's assertions, there was no testimony of any presently recalled conversation between Mr. Henderson and the Shelter Insurance Company relating to the request for change of beneficiary forms. At most, the facts would show that a caller to Shelter requested the forms to be sent to Mr. Henderson, and that the caller had access to his social security number. (See Intervenor's Response to Undisputed Facts at 6-8 and Ex. 6 at 13, 23.)

Further, although Ms. Mecham claims that she has presented evidence that Mr. Henderson expressed an intent to change beneficiaries, that evidence consists of the ambiguous statement in the affidavit of Tyler Henderson that he "knew" that Steve Henderson had named Chris Mecham as beneficiary. (Ex. 15.) Ms. Mecham's position is further eroded by Tyler Henderson statement that he and his uncle did not discuss any disposition of life insurance proceeds. (Ex. 15, ¶ 9.) Nothing in Tyler Henderson's affidavit "confirms" Steve Henderson's intentions regarding his life insurance or indicates Tyler Henderson had any direct knowledge of his uncle's intent. Defendant's assertion to the contrary is simply incorrect. (See Ms. Mecham's Brief at 6).

This leaves the affidavit of Sherry Williams, in which she states "based on my conversations with Steve, it was Steve's intention that the proceeds from his life insurance policy go to Chris Mecham." (Ex. 16.) No specific conversation or statement is referenced, and there is no indication whether Sherry Williams is drawing a conclusion from Steve Henderson's statement that "he wanted all his property to be left to Chris Mecham," or whether a specific statement was made to her. (Ex. 16.) The only "conversations" included in her affidavit relate to the will and his property, and not the insurance. This is in contrast with explicit conversations between Steve Henderson and Ryan Webb when the insurance was originally arranged for, in which he provided explicit direction to Webb regarding disposition of the proceeds of the policies. (Ex. 3 at 23.)

**D.     The facts, taken in the light most favorable to Mr. Webb, show that the signatures on the original change of beneficiary forms are forgeries.**

Mr. Webb has submitted uncontroverted signatures of Steve Henderson, including two documents actively asserted by Ms. Mecham to be Mr. Henderson's signature – the will and the power of attorney. In addition to the visual evidence that the signatures do not match (See Ex 7,

6

Int. Ex 6), Dawn Reed included both of those documents in her "K-1" group of signatures – i.e. she found the signatures on both the will and the power of attorney to be consistent with each other, and others within the K-1 grouping. Ex 19. However, she explicitly found the K-1 known signatures to be inconsistent with the signatures on the change of beneficiary forms. In addition to handwriting indicators, she noted that Mr. Henderson always signed his name "Steven", yet the insurance forms were signed "Steve." The report of Dawn Reed presents her credentials as an expert and her findings. As discussed on pages 5-6, *supra*, despite Ms. Mecham's claims that other witnesses besides herself confirmed Mr. Henderson's intent to designate Ms. Mecham as beneficiary, the affidavits of those witnesses do not bear out this position.

There is also no proof anywhere in the submitted record that would demonstrate any party was specifically authorized to make Mr. Henderson's signature here. Although there may have been a practice of his authorizing others to make signatures on his behalf on checks, none of the parties who were authorized has indicated that they made these particular signatures on the beneficiary forms or had Mr. Henderson's authority to do so. Under those circumstances, the facts taken in the light most favorable to Mr. Webb show that the signature on the beneficiary form was not Mr. Henderson's, and was not authorized.

Intervenor disagrees that in the context of this action any intent to deceive must be proved. As noted above, and in Ms. Mecham's brief, insurance beneficiary designations are akin to testamentary instruments. *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902 (2010); *See American Found. Life Ins. Co. v. Wampler*, 254 Ark. 983, 986, 497 S.W.2d 656, 658 (1973). In that context, in the absence of an actual signature by the party in question, or proof of authorization, the document should simply be considered invalid. See *Black v. Morton*, 343

S.W.2d 437, 233 Ark. 197 (1961) (no intent addressed by the court, but simply whether the signature on the will was that of the testator); *See also Ross v. Edwards*, 231 Ark. 902, 333 S.W.2d 487 (1960). In the context asserted here, all that need be shown is that the signature is forged, not that some legal requirement of deceit be met. Ark. Code Ann. § 28-25-103(a) explicitly requires in the context of wills that a testamentary document must be in the signature of the testator, or alternatively, where a testator directs signature on his or her behalf, that "[t]he person so signing [at the testator's direction] shall write his or her own name and state that he or she signed the testator's name at the request of the testator." Here the signature is not Mr. Henderson's, nor is there another identified party signing on his behalf. Indeed, there is no allegation at all by the movant that there is any evidence as to whom would have been directed to sign for Mr. Henderson. Under these circumstances, no proper change of beneficiary form was executed, and the contract between Mr. Henderson and Shelter was not changed. See *Primerica Life Ins. Co. v. Watson*, 207 S.W.3d 443, 362 Ark. 54 (2004)(Burden is on proponent of change in beneficiary to show "insurance contract was changed to her name as the beneficiary.").

E.     **Laches is neither applicable nor available as a defense for Christine Mecham**

Laches is only a bar where there is "some detrimental change in position made in reliance upon the action or inaction of the other party." *Turner v. Eubanks*, 759 S.W.2d 37, 40, 26 Ark.App. 22 (1988). In *Jaramillo v. Adams*, 100 Ark. App. 335, 268 S.W.3d 351 (Ark. App., 2007), the Arkansas Court of Appeals held that:

> The doctrine of laches is based on a number of equitable principles that are premised on some detrimental change in position made in reliance upon the action or inaction of the other party. *Self v. Self*, 319 Ark. 632, 893 S.W.2d 775 (1995). Laches or estoppel does not arise merely by delay, but by delay that works a disadvantage to another. *Ueltzen v. Roe,* 242 Ark. 17, 411 S.W.2d 894 (1967). So long as the parties are in the same condition, it matters little whether one presses a right promptly or slowly within limits allowed by law. Id. But where one, knowing his rights, takes no steps to enforce them until the condition of the other

>party has, in good faith, become so changed that he cannot be restored to his former state if the right be enforced, delay becomes inequitable and operates to estop the asserted right. *Id.* This disadvantage may come from loss of evidence, change of title, intervention of equities, the making of substantial improvements to the land, and other causes, for where the court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief. Id. Put in other terms, estoppel is merely the manner, in courts of equity, and sometimes even in courts of law, where when one party, or one group of parties sit idly by and do not speak when, in good conscience, they should speak, they will not later be heard to speak when they should in good conscience, remain silent. Id.

Initially, laches is an affirmative defense, and the burden of asserting such a defense is on the the party asserting. *Pharr v. Fink*, 237 S.W. 728, 151 Ark. 305 (1922). In the context of Ms. Mecham's purported reliance interest, it is her testimony that she did not know she had been named beneficiary until 2011. It is difficult to see how there could be detrimental reliance or change in position based on inaction relating to a fact about which one has no knowledge. Further, no action could have been taken in the time frame asserted (prior to Mr. Henderson's death) in any event. Neither Mr. Webb nor Ms. Mecham would have had an interest in the proceeds of the policy until Mr. Henderson died, thus neither had a vested interest to protect. *Orsini v. Commercial Nat. Bank*, 6 Ark.App. 166, 639 S.W.2d 516 (1982)

In addition, the underlying allegations here are forgery and undue influence, particularly based on Ms. Mecham's confidential relationship with Mr. Henderson. No action taken subsequent to exercise of undue influence or forgery could be taken in good faith.

Finally, under any circumstances, there would be no delay in relation to the issues of forgery in this case, as there is no testimony that would indicate Ryan Webb had any notice that the insurance forms may have been forged until after Mr. Henderson's death. Ex 3 at 45-47 (Webb relying on handwriting expert).

F.  **Conclusion**

The Intervenor here has demonstrated that issues of material fact remain in this proceeding, including, but not limited to:

- Issues of whether Ms. Mecham was in a confidential relationship with Mr. Henderson and whether she was the dominant actor in that relationship.

- Issues of whether Ms. Mecham could meet the burden of proof that arises where a dominant confidential relationship exists.

- Issues of whether the signature on the change of beneficiary form in question here is Mr. Henderson's.

- Issues of whether Mr. Henderson intended to change the beneficiary on his life insurance.

Proof of most of these issues depends primarily on determinations of credibility of Ms. Mecham, Ryan Webb, Gail Williams, Alan Williams, and Debbie Webb, which are not appropriately made in summary judgment proceedings. However, to the extent credibility is relevant, Ms. Mecham's propensity to prevaricate, and in fact misrepresent the nature in her relationship with Steve, is significant. She and Mr. Henderson certainly had a relationship, and that relationship was clearly more than "close friends." Ms. Mecham's distinctions between a "sensual" dialogue and a "sexual" one between her and Mr. Henderson are a distinction without much difference, and her claims that there was neither sexual relationship between her and Mr. Henderson nor sexual discussion in writing are belied by Mr. Henderson's letter and the email found by Alan Williams. It is also clear from the letter that contrary to her testimony in deposition, Ms. Mecham also promised early on to marry Mr. Henderson. Ms. Mecham has made little or no effort to comply with discovery on the issue of her communications with Mr.

Henderson, and given the content of what has been found, Intervenor submits it is within the fact-finders' purview to presume that those emails contained more of the same – promises of marriage, sexual talk and innuendo, and actions by Ms. Mecham designed to encourage a belief by Mr. Henderson that he could both trust and depend on her. No weight should be given to Ms. Mecham's testimony about her relationship with Mr. Henderson in a summary judgment proceeding under these circumstances.

Summary judgment should be denied on all issues here, and this matter should be set for jury trial.

            Respectfully submitted,
            Ryan Webb, Intervenor

BY:  /s/ Casey Castleberry
    Tom Thompson, ABA #77133
    Casey Castleberry, ABA #2003109
    MURPHY, THOMPSON, ARNOLD,
     SKINNER & CASTLEBERRY
    1141 East Main Street, Suite 300
    Post Office Box 2595
    Batesville, Arkansas 72503
    (870) 793-3821 - telephone
    (870) 793-3815 – facsimile
    aftomt2001@yahoo.com
    caseycastleberry2003@yahoo.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 4, 2013, a copy of the above and foregoing was served upon the following counsel of record via the Court's CM/ECF system:

Mr. Clay Stone
Mr. Alex Gray
MITCHELL, WILLIAMS, SELIG
 GATES & WOODYARD, P.L.L.C
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
cstone@mwlaw.com
agray@mwlaw.com

Mr. Mel Sayes
MATTHEWS, SANDERS & SAYES
825 West Third Street
Little Rock, Arkansas 72201
msayes@msslawfirm.com

       /s/ Casey Castleberry
       CASEY CASTLEBERRY